Mr. Nutter. Thank you, Judge Mnuchin. Good morning, Your Honors. May it please the Court, my name is Daniel Nutter. I represent Mr. Ramon Ramos-Acevedo. In opposing the guideline sentence of 135 months, the district court intended to impose a sentence comparable to defendants with similar records who had been found guilty of similar conduct and believed it was, in fact, doing so. Unbeknownst to the Court, however, its sentence actually represented a 15-month upward variance from the average sentence. Kennedy Well, wait. When you say unbeknownst to the judge, he did have that information before him in the pre-sentence report, didn't he? Ramos-Acevedo Well, yes. And actually, I think that's an important fact to consider in terms of Jenkins, insofar as these data were readily available to the judge. But it's apparent from the – from Judge Shea's discussion that he believed that simply imposing a within-guideline sentence was sufficient to avoid sentencing disparities. Kennedy But isn't it accurate that the sentence that he imposed was very close to the median sentence in that data for people who trafficked in 5 kilograms or more of cocaine? And he explained several reasons why he believed that Mr. Ramos-Acevedo should receive a longer sentence than the typical person in that category, because, A, he also trafficked in fentanyl, and the judge gave a very lengthy discourse on why that justifies a higher sentence. And he also talked about Mr. Ramos' record in ways that would distinguish it from just having reached criminal history category 3. He talked about the age of the defendant, right, as an aggravating factor. So I'm having a little trouble understanding why one would think that the judge thought he was giving, like, a minimal sentence or, you know, that he should – he should have looked at the fact that the average sentence is 120 months rather than the obvious fact that the median is very close to what he gave. Well, first of all, I'll note that actually in the most recent – since this was done, the median is actually now also at about 120 or 121, I think in large part because of the effect that the JSIN is having in helping to help judges realize that there is – But that's not something that was before the judge or was accurate at the time, apparently, of the sentence. No, no, that's right. So let me get more to your other point, which is that in dozens of cases, this Court has noted that before you can apply the individual facts and characteristics of a case, you need to know what the typical sentence is. And here, it does not – the Court was under the impression that the typical sentence was still going to be in 135 to 168, and I agree with Your Honor that there were aggravating matters that the Court considered. There were also mitigating matters that the Court submitted and ultimately came to the idea believing that he was not imposing a significant variance or – But we've said that, right, in our cases. We've said that the need to avoid nationwide disparities is not as pronounced when you're giving a within-guidelines sentence, right? So it's not inaccurate to say that it's less of a concern when you're within guidelines. I grant that there's something more to do than simply acknowledge that you're within guidelines. But if he says – he acknowledges the need to avoid nationwide disparities. He says he's imposing a within-guidelines sentence at the low end of the guidelines range that, in fact, turns out to be a couple months higher than the median sentence for this class of offense. And he identified aggravating factors that show why you might be above the median, which is the fentanyl and the age of the prior sentence. I mean, why is that – how is that an abuse of his discretion? Well, what I would say, Judge Minoshi, is I would disagree with the initial characterization that you made about – I mean, yes, the Court has said that there are frequently less concern when it's in the guidelines range. But again, Jenkins takes a step back from that. There says there is concern when, in fact, the guidelines is not being – is not doing what the guidelines are supposed to do as well as they should, which is actually to differentiate between different categories of culpability. And, Your Honor, Judge Lynch actually, in a case called United States v. Malente, wrote a very cogent concurrence in which you talked about a similar idea in the criminal history scenario where the same six criminal history points could be a violent street predator or it could be someone who is temporarily unhoused and dealing with substance abuse issues. The argument you're making now is that he should pay attention to the culpability associated with a particular type of controlled substance that's underlying the offense. And it's really hard to argue that the district judge here wasn't paying attention to that because he says, okay, you were trafficking cocaine, but you were also trafficking fentanyl. And he goes on and on about what a danger fentanyl is and about the fentanyl epidemic and how many deaths it's causing. So to say that he wasn't appreciating the culpability associated with a particular substance seems not to be consistent. That's not at all what I'm arguing, Your Honor. And I'm sorry if I gave that impression. What I'm arguing is the difference is between sex offenders and fraudsters and substance abusers. As the JSIN data shows, for this — for a defendant in the same cell, which is 313, again, same 135 to 168 guidelines range, but someone who is there because they've committed a sex offense gets an average sentence of 164 months. Someone who is in that cell because they're a fraudster gets an average sentence of 145 months. Sure, that's fine. But then what he's looking at and what you're calling our attention to is precise — is the more precise data, the very precise data that is focused on people with 5 kilograms or more of cocaine as the category. The problem is that's still not nuanced to the degree of saying, well, what about people who have 5 kilograms of cocaine plus whatever it was, a half a kilogram of fentanyl, and how does that play out? You know, these are useful data. But there's certainly no indication that the judge thought — you know, what the data that you just cited shows is that judges sharply discriminate between level, what is it, 31 category 3 sex offenders and the typical drug dealer, who is by far the more frequent person in this category, or the same cell getting much more lenient treatment, rightly or wrongly, in the case of white-collar offenders. We're talking about the people with the cocaine. That's what the data that you're relying on say, and that's — it seems to me not all that persuasive. But the real distinction — and you're right, we can keep on dividing further and further forever. That's why eventually we have a judge who's going to consider it. But what the procedural inquiry asks first, before we get to that substantive inquiry where we get into the individual details, is what can we say about the typical offender? Because before you know what's typical, you can't know the reasonableness of what's atypical. And where the real division lies here is between, again, the people who are committing fraud, the people, you know, where it's in the — So I'm looking at this chart, right? So the chart is offenders who are at 31-3 who do theft and fraud as the primary offense, get an average of 145 months, and prohibited sexual acts, 164 months. He's not — you know, he's below those averages, right? And then so what you're focused on is 31-3, where the primary offense is narcotics and the primary substance is cocaine, get an average of 120 months or a median of 132, right? Yes. Right, so the idea is, well, he's slightly above the median for somebody whose primary offense is narcotics with a substance of cocaine. But then the argument is, okay, well, even taking that as a benchmark, the district court gives a lot of reasons why you should be above the median, which is that it's not just cocaine, it's also fentanyl. He has a prior sentence of 120 months. You need an incremental increase. And he keeps committing offenses into his 40s, which is atypical. But again, the idea — the reason why we care about the guidelines at all is because they're representing empirical data that's essentially collecting this entire set of the fraudsters and the sex offenders. That's how you get to 135 to 168 in the first place. But it's combining all these people, again, sort of like in your Valente concurrence, the violent street predators and the unhoused people. Which is why the judge gets to consider the 3553A factors, one of which is the guidelines, others of which relate individually to the defendant, and none of which specifically instruct the judge, oh, look at the backup data from the Sentencing Commission. But Jenkins essentially does. Which the judge is entitled to, but I'm not sure I see. Well, but in Jenkins also, we say nationwide disparities — in the ordinary case, a court implicitly gives sufficient weight to the need to prevent unwarranted sentencing disparities when it has carefully, correctly calculated the sentencing guidelines, right? Yeah, but — This seems to me to be as close to an ordinary case as you can get. I think there's a lot of work being done by those words, carefully considered. I mean, I think what we're sort of getting into is, have they been carefully considered when there is data right there in the PSR saying that the average sentence is 15 months below? I understand your point. Can I just ask one factual question? And I'll preface it by saying it's probably an unfair question, and you can just say I've never thought about that, or I'm not a statistician, and not answer it. I'm just puzzled because I'm not a statistician. But it seems to me odd — I'm not sure I can even figure out — how it could be the case that the median sentence is 135 months for people with 5 kilograms of cocaine, meaning that half of the people got that or more, and still have the average be 120 months, which is the mandatory minimum sentence for someone with 5 kilograms. Well, I can't explain this easily. Okay, well, maybe you can. Because the data excludes cooperators, and I'm not sure how you could be a safety valve person with a criminal history category of 3. So help me out. This has an easy answer. The mandatory minimum is not 10 years for all the defendants in here. Ultimately, the number is going to be calculated by the total amount of narcotics, because that's independent. But people could be — just based on the plea agreement. People were in charge with the specific mandatory. If they pled guilty and the government — Yeah, and the government says B1B instead of B1A. That would lead to a C count, for example. Yeah, or even just a 5-year mandatory. Or a V count or something else, but then still insisted on the guideline calculation being an accurate number of the drugs. Then you could avoid the mandatory minimum. Yeah, I don't even think they need to insist on it. That's going to be done separately. But even if that's happening, that just shows that this 120 average is not accounting for people like your client, where presumably the government had some reason for being charitable and skipping the mandatory minimum. Here's a case where there was insistence on the mandatory minimum. Well, I think that really gets more into — I don't — I think when you look at the text of 3553A6, it talks about similar conduct. And the similar conduct is that you are trafficking a certain amount of the drug. And it's the amount of the drug that's going to be the same whether the government charges it as 841A or B. Plea guilty might be part of the conduct that you take into consideration when you arrive at a sentence, right? It certainly can be considered as part of that second substantive reasonableness issue. But I think what we're saying is what needs to be figured out to be the typical sentence before you get to that second part of the analysis. And this was the deal that the government offered him as distinct from the deal that they might have offered somebody else. Yeah. It could be very possible that upon remand and being told to consider this, the Court still decides to give 135 months. But what I would respectfully suggest, and I know I am over my time, so we could talk about this again at rebuttal. But what I would respectfully suggest is that since — at least I think that the supervised release condition issue here presents about as clear-cut a remand issue as essentially you're going to see. So some remand is going to be set back simply asking the Court to address, maybe in a chamber's opinion — But I'm not sure about the supervised release condition, just on this other thing about the sentence. I mean, I'm not sure we can tell from the record that he — that the district court ignored the JSIN data. But even assuming that he did, it is pretty clear — the defendant's argument was you should impose a sentence of 120 months because that's — all that's necessary. And the district court squarely considered that argument. He said, oh, actually, you have a kind of a strong argument. Maybe I should do 120 months. And he gives a bunch of reasons why 120 months would not be sufficient. So — and 120 months happens to be the average that you're saying when a void nationwide is buried. So isn't it pretty clear the district court just said 120 months would not be a sufficient sentence? And I'm rejecting that. And so even if there's some other independent reason why it has to be above 120 months, that is here in the record. And there's no way the district court was going to arrive at a sentence of 120 months. But — well, yeah. And he could — but he could have given something between 120 and 135. But again, one of the reasons why he didn't give 120 months is because he was concerned about unwarranted sentencing disparities. He made it clear that he was, in fact, considering that. And he thought that avoiding unwarranted sentencing disparities was tethered to an 135- to 116-month range. So that was one of the considerations that went into that. And I think DOR v. is very similar on this idea. DOR v. — But DOR v. is about a guideline that the court thinks is itself substantively unreasonable. And within the guideline, sentences are not reasonable. I mean, we haven't said that about this guy. There were several issues in DOR v. But the first one, which is the part that's not discussed as much, but is the procedural unreasonableness. And that was the part where the court failed to consider that there was a 20-year statutory maximum and, therefore, thought that the range was 262 to 327. And thus, when he gave 233, thought that he was giving a substantial downward variance from the 262- to 327-month range. But, in fact, the range should have just been 240. — On this record, I mean, you're saying that you think, because he just said the guidelines take care of nationwide disparities, that he misunderstood that, in fact, there was a nationwide disparity even within the guidelines. — Yeah, I think he thought that he was imposing a nondisparity— — —where he doesn't perceive a statutory maximum or something to that effect. Like, he doesn't, like, miscalculate the guidelines. Like, there's no error on that level. I think he miscalculated what he thought the average sentence for someone who had committed the same conduct as my client was. I think he did not realize that the average sentence opposed was 120 months. He thought that the average was somewhere in the 135— — We might as well just ask about the supervised release condition. — So, in— Ramos-Acevedo's presenting memorandum, it even says, like, he could use mental health treatment. And so the PSR is specific about the type of mental health treatment, which is the cognitive behavioral therapy condition. The district court gives their reasons that normally people age out when they reach middle age from criminal behavior, but he hasn't done that, which means that he's making bad decisions. And so cognitive behavioral therapy is designed to help people make better decisions than their— So if he's saying, I can use mental health treatment, and the district court's saying, well, here's the particular kind of mental health treatment that would help you under the circumstances of this case, why are you saying it's obvious that that's not justified? — Well, first of all, it's clear when he's referring to the mental health treatment, he's referring to the gambling addiction and substance abuse treatment, which, you know, have been imposed, and we're not questioning that. — Why is that true? — I mean, the pre-sentencing memorandum from Ramos S. Avedis is— urges the district court to consider Ramos S. Avedis' substance abuse history and also that he has not received significant mental health or substance abuse treatment. So those are two different things, right? — I think, you know, before I went to law school, I worked on contracts with the Substance Abuse and Mental Health Services Administration, and there's not really, I think, a huge overlap in the way that you— or a huge separation, I should say, between some of what mental health versus substance abuse is. But as for CBT, it's a kind of talk therapy that's usually used to treat mood disorders such as anxiety and depression. It doesn't help you make decisions in the sense of, you know, you're going to have better judgment and now you're going to be— — It's designed to get people over destructive patterns of thought that lead to bad decisions in their lives, right? — Again, I think if you look, for example, at the Mayo Clinic website, you're going to see it described very clearly as helping people deal with disordered eating. It's helping them deal with PTSD. — I mean, so the United States v. Harney, which is a suburban organization, we said cognitive behavioral therapy is designed in part to remedy psychological problems resulting from faulty or unhelpful ways of thinking and learned patterns of unhelpful behavior. — And we said that the cognitive behavioral condition was justified because the district court recently concluded that Harney was a person of very poor judgment who needed to improve self-regulation. — But respectfully, Your Honor, are there any defendants in any of these cases who you would consider to be people who exercise good judgment? — Right, exactly. I mean, this is— I don't—I'm not that persuaded by the idea that this was some kind of abuse of discretion. But I am puzzled as to why judges and lawyers are in a position to argue about, well, the Mayo Clinic's website says this is how CBT works. Well, there are other ways of thinking about it. I've always thought that what you were describing is just general straight behaviorism, like treating pigeons to click the key, that, you know, if you're worried about changing people's anxiety level by exposing them gradually to the things that stress them and all that. But cognitive behavioral therapy has always struck me as kind of, just get your act together. You're doing stupid stuff, and let's do it differently. And let's teach you ways of doing it differently. Now, that may be right or that may be wrong, but I'm just puzzled as to why judges are the ones who are going to decide what kind of mental health treatment is appropriate. I do see a link here that this kind of cognitive behavioral stuff may be both less intrusive and better, in a way, than talking about your childhood in some sort of Freudian way or taking a drug to reduce your anxiety or something like that. But I just don't understand why we're in the business of picking the therapy. But that's not your argument. Your argument is you didn't need anything beyond what was already covered by the addiction issues and... Well, no, this was my argument. As I noted, it also was vague and gave too much authority and judgment to the probation officer to be... Well, it's necessary to have authority as the probation officer. If the district court had just said you should get the mental health treatment, but the probation department can decide what type and what the provider would be, that would be more vague and give more discretion to the probation department, right? But again, I don't think that would have necessarily... The problem here, if there were not the threat of him being reincarcerated, if he fails to live up to this vague notion, then no one would care. I would frankly love to see... It would be great if everyone could get some version of therapy and anger management and all these things. Anger management should be taught in schools, as far as I'm concerned. But we don't say we're going to lock people up if they fail. So you're saying we can never impose anger management treatment as a condition of supervised release? You certainly could, if there were a record to suggest it, other than the fact that a person is in his mid-40s and needs to, you know, think about things differently, which is all that the record says as a basis for having the threat of backup incarceration. The record explains, you know, most people, when they reach middle age, age out of criminal behavior. And so maybe he is trapped in what we have called learned patterns of unhelpful behavior. Well, I'm fully 15 minutes over my time at this point. So respectfully, I'll sit down. I'll let the government speak and answer any additional questions you have on Rebid. Is that okay? Thank you, Mr. Neutter. We'll hear from the government. Mr. Stone. Good morning. May it please the Court. Assistant United States Attorney Jeff Stone on behalf of the United States. The Court should affirm the District Court's judgment because the sentence was procedurally reasonable. The Court carefully considered the 3553A factors, including the need to avoid unwarranted sentencing disparities, in addition, the Court properly imposed... Well, did it carefully do that? I mean, it does say, turning to the issue of disparities, this particular factor is aimed at nationwide disparities, which is usually addressed, which is generally addressed by the guidelines. And this will be a guideline sentence. So there really is no issue of disparities. I mean, isn't that, doesn't the question of disparities require more than just saying it's within guidelines? I think all the statements the Court made reflect a couple of things. One, that the Court was considering the need to avoid unwarranted disparities with similarly situated people. From that statement I just read, doesn't it seem like the District Court thought that the issue of unwarranted disparities was resolved by giving a within guidelines sentence? You could say that that is sufficient, but I'm not sure it is. So, I don't know. Is that sufficient? And if it's not sufficient, how do we know the District Court did something more? I think the District Court's statements were sufficient, and I think that he accurately stated the correct understanding. The correct understanding is that when you give a within guidelines sentence, there's no further concern about avoiding nationwide disparities? I don't think that. I think what he said in total was that generally or usually the guidelines address the issue, namely the focus on nationwide disparities. And he says that here we have a guideline sentence. And so that might be true as a general proposition, but we have this JSIN data that says actually it matters for people who have a guideline of 31-3 what the primary offense is. And narcotics offenses are actually much lower than other types of offenses. And so maybe the need to avoid nationwide disparities requires looking beyond the guidelines range. In Your Honor, I would say that the record here strongly supports that Judge Shea did consider the JSIN data. He did? When did he do that? He never explicitly addressed that issue, and there was no reason to. Because neither party ever argued, made arguments about the JSIN data, either in the sentencing memoranda or in all arguments to the Court. One thing we've said frequently, always, constantly, is that we don't assume that a judge didn't consider something that was before him in the record because he didn't explicitly allude to it. And that is a point that we tried to make in our brief. So that's true. But we have that presumption that you don't assume that he didn't consider something unless the record suggests otherwise. But I guess my question is, when he says this will be a guideline sentence so there really is no issue of disparities, doesn't that suggest he didn't look to the data? He just thought it was conclusive because it was a within-guideline sentence. I do not read that as being conclusive. I read it in the full context of the three sentences that I believe Your Honor read about him understanding that this is a nationwide disparity I have to look at. Generally, or usually, the guidelines address this factor. And here we have a guideline sentence. So it's not really an issue here. And it wasn't an issue. But just the way you've just articulated it, this is a guideline sentence, so it's not an issue here, means that he didn't look beyond the guideline sentence. Except for the fact, Your Honor, that he explicitly said he read the PSR and the draft PSR. And if not, would you like to make a harmless error argument that takes the form that, in fact, the data themselves show that for this category of offender, the median sentence, meaning half the people get more than that, and half the people get less in that category, suggests that what he is doing by giving the bottom of the guidelines is quite clearly within a range such that it's impossible to make an argument that this would create a nationwide disparity, particularly given that the data does not tell us anything about who got less than 135, and who got 132, rather, and who got more than 132. So there's no way of saying that a person just like giving a sentence of 135 months to someone just like Ramos Acevedo is somehow outside the norm, or is creating some kind of disparity. Is that an argument that you want to make? Certainly, Your Honor, and I think Your Honor did a great job making that argument. I feel like you might want to make that argument, because I think we understand your position about why you would say that he did. He should not be assumed not to have considered this. On the other hand, there is the point that he kind of said, I'm not considering that, or at least I'm considering that I don't have to go there, in some sense. So it might be helpful to also consider the harmless error point. And again, I thank Your Honor, because you articulated that much more persuasively. Can I just ask you a thing, though? Just as a general matter, do you think it's accurate that the district court does need to do more than just say it's within guidelines? I don't think that the district court— Avoid nationwide disparities? I don't think— I understand you're saying it's not what he did here, but just as a general proposition. If you have to consider the need to avoid nationwide sentencing disparities, it's not—is it—or is it not dispositive if you're giving a within-guidelines sentence? I don't think that the district court needs to say more than that. While it may be preferable in some instances, this case was relatively routine, except for the fact that it was—it had some highly egregious factors, aggravating factors that the court clearly addressed in detail and impacted the sentencing. Now, in the cases that I prosecute— Just to be precise, the aggravating factors are what, the fentanyl? That he was trafficking kilogram quantities of fentanyl, heroin, as well as the cocaine. That fentanyl is at the heart of the opioid crisis in Connecticut. Our chief medical examiner produces annual statistics showing that on a daily basis, people continue to die from fentanyl overdoses in Connecticut, despite all of the awareness, the education, the efforts to address the crisis. Here we have a defendant who had an extensive criminal history, which included a prior major federal conviction for a drug trafficking offense, resulting in a 120-month sentence. And he was in his mid-40s, and he was continuing to commit criminal conduct. In fact, his criminal conduct, as Judge Shea recognized, had escalated. And Judge Shea was— Is that a unique thing? So the district court—so this also gets to the supervised police commission. But is that a well-supported proposition? Most people age out by the time they reach their 40s, and he doesn't. So there's something about him that requires some additional measure of deterrence or additional treatment. I would say that in many of the cases that I prosecute, which are involved in narcotics trafficking crimes, crimes of violence, and illegal firearms activities, that's an argument that's frequently made by counsel for defendants, that defendants who are in their 40s or older are at a period where they're aging out. And so many of the considerations that a sentencing judge may have for someone who's two decades younger engaged in the same conduct are not nearly as prevalent for this particular defendant. So you're saying district courts, sentencing courts, take that into consideration as a reason for leniency for a defendant who has aged out. But if there's somebody who has reached middle age but clearly isn't ceasing criminal activity, then it means that there might be an extra need for deterrence because that's out of the ordinary. I think it certainly stands out that you have someone in their mid-40s who's not only continuing along the same conduct but is actually escalating that conduct. So can I ask a question about the cognitive behavioral therapy conditions? So Judge Lynch suggested a moment ago that that just means shape up. I mean, is the condition more than that? Is it a kind of treatment that is justified under the circumstances here? So I have a layperson's understanding that's very basic about cognitive behavioral therapy. But my understanding is where you have persons who have demonstrated consistent behavioral patterns or decision-making patterns, like the defendant in this case, cognitive behavioral therapy can be a form of therapy that's really targeted to address that type of conduct. So the opposing counsel was suggesting a moment ago, well, every criminal defendant has made bad decisions. That's why that person is a criminal defendant. And so does that mean that this cognitive behavioral therapy condition would be justified in every case? I think there's a matter of degrees. I would say that anyone who commits a crime probably made a poor decision in most cases, even rare cases where they didn't. But where you have a PSR that's littered with bad decision after bad decision after bad decision. And we have a lengthy criminal history. We have escalating conduct. We also have a failure to obtain gainful lawful employment. We have substance use. We have gambling. We have sort of an array of bad decisions, all of which are contributing to the life he's leading. I mean, you say he has substance and gambling, but there are separate conditions for substance abuse and gambling addiction. So he's not challenging those. So why aren't those sufficient? Because that would be addressing only part of the problem. I don't think you can look at the history and characteristics, as it's outlined in this PSR, and say that his narcotics use and his gambling activities were what caused him to engage in this criminal conduct and are the reasons for it. And if we just focus on those, which are not good things, were clearly problems for him in the lifestyle he was leading, but would be far from sort of the necessary treatment that he appears to need to get on the right track. And it's not only the treatment he appears to need. It's the treatment that he was advocating for through his attorney before Judge Shea. I mean, he was on notice. I mean, I quoted his pre-sentencing memorandum to Mr. Nutter, and Mr. Nutter said, well, when he says mental health treatment and substance abuse treatment, really mental health treatment refers to substance abuse treatment. So you think that that's not correct? I don't think it's correct. The draft PSR, which was also provided, shows that the probation office was initially recommending general mental health treatment. And then in the final PSR, the probation office explained that they were changing general mental health to cognitive behavioral treatment because they specifically wanted to address his poor decision-making. And that was really what caught the judge's attention. And the judge focused on that poor decision-making and made a number of comments about that in sentencing Mr. Ramos-Acevedo. And that's precisely what CBT was designed to do. Now, the important thing is that the defense never objected to those conditions. Quite the opposite. They appeared to lean into it. The defense emphasized on multiple occasions that Mr. Ramos-Acevedo had limited mental health treatment and substance abuse treatment in his history. And they advocated for probation-directed treatment as being critical to his ability to succeed. Critical to his ability to live a positive, law-abiding life. That's what they advocated for. What about the idea that the condition is vague? So if you were saying that you don't quite understand what it is, you emphasize you have a layman's understanding and that your understanding is that it helps you make better decisions, does that just kind of sound like a vague condition? To a layperson like myself, it's vague. But I also don't know the intricacies of substance abuse treatment or gambling disorder treatment. I know nothing about them other than their accepted terms that are talked about in society. I would think it would be more vague if it was just mental health treatment. I think the probation office, in preparing the PSR, wanted to fine-tune that and be a little bit more directed about what they were proposing. What we usually say, though, when we talk about mental health treatment, is that it's really for the experts, starting with the probation department, but then once they send the person off for some kind of treatment, with the medical and psychological treaters to decide what kind of treatment is best for this particular person. It just strikes me that it's become almost fashionable. We did a little looking. We've had four cases, not all from Connecticut, some from the Southern District of New York, so I guess this is a probation-wide thing, that are asking judges to specify this particular mode of treatment. I was just curious about it, as to why judges should be getting... The opposite of it's too vague. Why is it that the judge is saying... Wouldn't it be weird for the judge to be saying, I think you could profit from a Jungian therapist or some other school of mental health treatment. It just seems like that's not our job, or yours for that matter. That's why it's probably a little unfair asking you these questions about the specifics of mental health treatment. It's not a lawyer's job. It certainly is not a lawyer's job. And to my knowledge, the district judges in our district, I don't know any of them that would be trained in that field. And here the district judge was following the recommendation of the probation department, which I guess is pretty similar to what would happen if the judge just said mental health treatment, and the probation department said, okay, we're going to first send you to somebody who does this particular kind of therapy. And I've never heard of anybody challenging that. That argument would lend towards the judge being more general and vague, and being less specific and less apt to tie it to the facts of this particular defendant and the record before the judge. As a practical matter, I think either of them would end at the same result, that once Mr. Ramos Acevedo was on supervised release, he would go to see a clinician, and then the probation officer who's supervising him would report back to the judge. And it would be if the current order covered the type of treatment that the clinician believed he needed, then that's what the particular defendant would get. But if it didn't, then they would go back and ask for a modification. And that routinely happens in our district. There are modifications for adjustments of that sort, and no one bats an eye at it. And usually because it could be a number of things. The assessment at the time of sentencing could have been right, but at the time that the supervision starts, a number of years may have passed, as in this case, and circumstances change. It's a dynamic environment, plus it's getting the input from the professional who's trained in that area and who's working with a particular client, as it may be at the time. And so even if the judge did get more general, I don't think by being more specific in a particular case that that's going to hand-tie the professional who's working with their client at a particular time in the future. Okay, but even if it's cognitive behavioral therapy or mental health treatment, what are the findings the district court made that justified the imposition of that condition, just that he's older and so is making bad decisions? Yeah, I think the judge did a little bit more than that. So what else did he do? He talked about the extensive criminal history he had and that he was getting to a point where he should have aged out of it. Well, that's what I just said, and that's the key thing. He thinks that there's something unique about him if he's reaching middle age and is still engaging in criminal conduct because that is not typical. Is that the idea? Yeah, I mean, that's the heart of it, is that he's still engaging in criminal conduct. It's an extensive history of criminal conduct, and the seriousness has continued to grow to the point of this case, which was the most serious. And again, the PSR was littered with instances of poor choices that have disadvantaged the life that Mr. Ramos-Acevedo was leading. Okay. Yeah. All right. Thank you very much, Mr. Stone. We'll turn back to Mr. Knoedler on rebuttal. Thank you again, Your Honors. Just a few brief points. Regarding this vagueness issue, part of the reason is because if you look at, you know, any judgment, but here the judgment is on page 109 of the appendix, it's even in the underlying text that if my client is somehow violates this vague term of condition, the court can impose a new term of imprisonment. How can he violate it? He violates it if he's told, go see Dr. So-and-so, who's going to give you this kind of treatment, and he says no. Now, where is there some vagueness or problem with that? And if he does go, then I suppose you might have some issue down the road as to whether he's being compliant or whether he's taking the treatment seriously, but that's something that would be true of any of these conditions. It would be true of the gambling treatment and the drug treatment that you don't object to in much the same way. I disagree with that. I think there's a very common understanding of what substance abuse treatment refers to in a way that we've all, I think, essentially. But even substance abuse treatment, it's not for the defendant to decide to go out and pick a provider who's engaged in substance abuse treatment. Like, he can't just go find his friend and say, oh, well, I'm going to meet with that guy regularly, and he's going to help me get over substance abuse, right? The probation department has authorized providers, and they say go to this person. So he could only violate the condition if he doesn't do that. I understand if you're saying, well, maybe the district court will come back later and say, okay, well, he did go to the provider that the probation department identified, but that person isn't practicing exactly what I consider to be cognitive behavioral therapy. But that would be a bizarre way to say that he's violating the conditions of supervised release. That would be like saying the probation department sent him to something that it thought was substance abuse treatment, but I've decided independently that it's not really. I don't think that's what I'm saying, respectfully, Your Honor. What I'm saying is that my client is sitting looking at a court order telling him if you don't do X, I can decide that I'm going to put you in jail. And even as we all sitting here in this courtroom have, I think, acknowledged we don't even really know what X means. So how is my client going to know what X means? X means go to the guy that probation says is doing cognitive behavioral therapy. That's all it means. It's not — I just don't get it. What is the vagueness in terms of what is required of your client? If this were a criminal statute, you know, 18 U.S.C. —  But it's not a criminal statute. But it has the same effects on my client as if he were to violate a criminal statute, which is that he can have his liberty taken away and he'd be in prison. And what is it exactly that you're concerned you don't know on behalf of your client or he would not know what he is supposed to do to comply with this condition? Can you explain to me what choices he would be faced with that he would not know how to make because he cannot understand what is required of him by this condition? Because it's, again, something that's just open-endedly being allowed for probation to be actually determining what the scope of this condition is actually going to be, which is — But, you know, so what you're really saying is not that it's too vague for your client to understand, but that it gives too much discretion to the probation department? Yes, it exceeds the authority. Why is that more so than if they gave — if the judge gave mental health treatment as a condition? I'm not sure mental health treatment would meet that as far as I'm concerned either, but it's not — How many hundreds, thousands of defendants have been sentenced to a condition of supervised release that they get mental health treatment? In all of those that they do, it's been — 18 U.S.C. 3583d requires that there be a particular relationship. You can look at the PSR. If someone is suffering from a narcissistic personality disorder and it's described in the PSR and then they're saying you need to get mental health treatment, we put those together. So you said earlier that you had read something about cognitive behavioral therapy that suggested it's to treat conditions like anxiety. So let's say the record here — I know that this is not what the record says, but let's say the record said that your client suffered from an anxiety disorder. Yeah, then we would have no objection. I would have no objection. So the problem is not the vagueness of the term cognitive behavioral therapy. You just think that it isn't justified based on the record. That is a different question from whether anybody could understand what it means when it's imposed as a condition. I think the problem is the vagueness in the context of the PSR and the surrounding things. I would say that there are a lot of situations where it's not vague because the surrounding context makes it not vague. We can encounter those kinds of situations all the time. By itself, it's vague, but you have surrounding contextual stuff that makes it not vague. Here there isn't any of that surrounding contextual stuff to make it clear what precisely, other than the substance abuse and the gambling, that the cognitive behavioral therapy is supposed to do other than decision-making. Okay. So once again, this is about whether the record justifies imposing this. It's not about whether it gives the probation department too much discretion to decide what to send him to. And it's not about him not knowing what to do to comply with what the probation department tells him to do. It's a separate question. But you have your argument, and we've understood it, that there's not a good enough reason to impose this on him. I don't think those are separate questions. I think it's giving too much to probation because probation hasn't identified in the first place, prior to the sentencing, prior to the judge's determination. Fair enough. So your argument is that unless the sentencing court can identify a specific problem that he has, ordering something like cognitive behavioral therapy or mental health treatment gives them too much discretion to pick a provider because there's no target. They're just kind of generally giving him treatment, but there's not like a particular problem with him that's being addressed. And so that, under the circumstances, you're saying is too vague or creates too much discretion. I'll try to state this in the clearest possible way. I do want to get one last thing on the length of the sentence. The clearest possible way for me to say this is that Congress passed the statute. It's 18 U.S.C. 3583. And subsection C and D of that statute talk about what a court is supposed to do before they can impose a condition. And this Court has interpreted those statutes in a number of opinions, most specifically United States v. Sims, which goes through like seven things that the Court is required to do in order to ensure that they have considered and most closely tethered any of these conditions to a particular defendant precisely because of the threat of incarceration that can attach to it. One of those seven things, the seventh that was mentioned in Sims, is not delegating this authority too much to probation. That is one of the seven, but the others talk about the closeness of the relationship and the consideration with the individual defendant. And when the Court fails to do that before imposing the condition of supervised release, it's not a valid condition of supervised release.  Okay. I think we have that argument. You said you wanted to make one final. Why don't you just make your final point? Yeah. So one of the questions was when the Court has said that they're assuming that the guidelines is avoiding unwarranted sentencing disparities. And then the question is, well, can we presume or not whether or not the Court considered the JSIN information. And one of what Judge Lynch was suggesting is we often make a lot of these presumptions even when things are not always set on the record. But I would suggest that almost always when those presumptions are being made, they're about things like the specific 3553A2 factors that the Court is applying in every single case and has been for pretty much as long as anyone has been a judge. The JSIN information only began two years ago. It's still only been rolled out in the PSR here, right? It is in the PSR. We've applied that presumption to the PSR, which is something that's before the sentencing court. Well, but back to your sentencing judge says I consider the PSR, right? The PSR in this case, including the addenda, is something like 43 or 44 pages. And we're talking about just... Do judges read every page of the sentencing court? I expect that they do. I obviously do. So I expect that they do as well. But when we are taking this brand-new thing that's just been implemented, it's not something like the 3553A2 factors. It's not like many of the things that, again, we... You know, the Court doesn't have to say I did not base this sentence on your race or ethnicity. But we know... The Court doesn't have to specifically say that to know that they weren't taking this plainly illegal reason for considering the sentence. Those are the kinds of presumptions where we can clearly say, look, we know that the Court was considering this. Here, in light of the Court's specific statement of saying, well, I think that a guideline... Yeah, I just think that, from my perspective, the better version of that argument would be he does seem to say that the nationwide disparity analysis is conclusive based on the guidelines. And that makes sense because until recently, there weren't more refined data available. And so that's why we should understand the statement as indicating that he didn't take into account the data. I think we have that argument. Thank you very much, Mr. Uder. The case is submitted.